PRATT *v.* STATE.

Division B.   Dec. 10, 1951.

No. 38241  (55 So. (2d) 453)

W. E. **Stone** and **Paul Moore**, for appellant.

**Joe T. Patterson**, Assistant Attorney General, for appellee.

**Roberds, P. J.**

Appellant was indicted for murder of Howard (alias Shorty) Armstrong; convicted of manslaughter and sentenced to the state penitentiary for fifteen years. Able counsel for appellant raises a number of questions on the appeal but we deem it necessary to discuss only two of them. One was the refusal of the trial court to instruct the jury to find him not guilty and the other the granting to the State of the instruction hereinafter set out.

The first question calls for a review of the testimony.

The killing occurred in the afternoon of February 22, 1948, in the municipality of Calhoun City near the home of appellant and the residence of Ellis Blue. Raymond Bailey testified that he operated a gas station and Armstrong was at his station some ten minutes before he was

killed; that the killing took place about one hundred yards from his station. He heard two shots. He immediately went to the scene of the shooting. Armstrong had been shot twice, once in the left side of the neck and the other through the heart. Appellant had in his hand a pistol belonging to Armstrong. Witness helped carry Armstrong into Blue's residence, where he died almost immediately. The pistol had been fired twice. Witness called the sheriff, to whom, on his arrival, he gave the pistol. He did not think either appellant or Armstrong was drinking. He considered Armstrong a peaceable man.

Laura Armstrong was the wife of the deceased. She was in her home but saw the shooting. She said "he (defendant) come on my husband and got the gun and shot him." Her husband was doing nothing to Pratt. Armstrong backed up at the first shot. They were close together. The first shot hit Armstrong in the neck. He put his hand up to his neck. She thought more than two shots were fired. Her husband said nothing to Pratt; he was not coming upon or making any demonstration whatever towards Pratt. She does not know whether her husband and Pete Nolan had been in a scuffle. She saw defendant take the pistol from Armstrong but does not know just how it was done. Defendant had one arm around Armstrong. Her husband was thirty-nine years of age.

Jess Yancy, Sheriff, introduced the pistol used in the shooting.

Howard Armstrong was seventeen years of age and a son of the deceased. He testified he was some eighteen feet away. He saw Pratt shoot Armstrong twice. Armstrong was doing nothing to Pratt. Defendant had the pistol in his hand; Armstrong had nothing in his hand and was making no demonstration whatever towards Pratt. After the shooting, Pratt walked to the corner of the house and looked back at Armstrong upon the ground. Said he and other children had been playing

ball in a nearby lot but he had then come into the yard near the Blue residence. The two shots were fired by Pratt close together and Armstrong was backing away.

Willie Rogers Armstrong, another son of the deceased, was fifteen years of age. He said he had been playing ball with his brother and others in the lot but had come to the yard back of the Blue home. He saw the shooting. Pratt took the pistol away from his father. He thought they were playing until Pratt shot Armstrong. The first shot struck Armstrong in the left side of the neck; Armstrong threw his hand to that spot and Pratt shot him again. At the first shot, Armstrong backed up, and at the second shot he fell to the ground. Armstrong was doing nothing whatever to Pratt. The two men were not far apart. He did not know the number of feet. He pointed to a tree just outside the courthouse as illustrating the distance between them.

That, in substance, was the testimony offered by the State.

The defendant introduced Pete Nolan. He and Blue and Pratt and Armstrong were present. Witness had a pistol. Armstrong had a pistol. Witness fired his pistol once into the ground. Why he did that is not explained. His explanation of the situation was this: "Well he (apparently referring to defendant) come out there and we were all standing there in the yard talking and laughing, and Shorty was standing off from me and Cedell walked up there and we were all laughing and talking and I started in the house, and I looked around and heard the gunfire, and it looked like they were playing there by him scuffling." He said Pratt and Armstrong were close together. He was asked "When the second shot was fired what was the condition?". He replied "The same, and Shorty fell when the second shot was fired." He said Laura Armstrong was not in the yard. She had said she was in her house. This witness was asked: "Pete, you and these other boys you mentioned were out

in the yard near Shorty's house? A. Well, pretty close to his house.

"Q. About how close where this shooting occurred to Shorty's house? A. A little farther than to the back of this courtroom.

"Q. It was right there near. A. Yes, sir." He said his house was as close to the Armstrong house as from the witness stand to the back of the courthouse. He was asked: "He (defendant) got Shorty's pistol?", and replied "Yes, sir." He was also asked: "And he shot Shorty with this pistol? A. That is what they say.

"Q. How is it you didn't see him when he shot? Had you walked away? A. When I looked around they were in a scuffle when the shot was fired—that is the way it seemed to me. That is the way it was when I looked around.

"Q. Where were you? A. In the kitchen door.

"Q. And yet you looked around in time to see they were in a scuffle and see the defendant when he shot Shorty in the neck the first time, and when he shot him again in the breast they were not in a scuffle? A. Yes, sir." Witness said he did not see Howard Armstrong and Willie Rogers Armstrong at the scene. He admitted that Laura Armstrong, wife of deceased, who had testified for the State, might have seen the shooting from her home. It will be noted this witness was not very clear, and positive as to the circumstances surrounding this shooting. He said he was walking away. He does say, however, appellant shot Armstrong twice, and he does not claim Armstrong was doing anything whatever to, or towards, Pratt, and for some unexplained reason the witness himself had a pistol and had shot it into the ground.

The other witness introduced by the defendant was Ellis Blue. The homicide happened right near his house. He said he was on the inside of his house. Nolan and Armstrong were on the outside. Pratt came up. He

heard them talking and laughing. Here is his description of the scene and the events:

"Q. Just state what happened then with reference to where you stood, what you saw with reference to this boy, Shorty? A. Well, I was inside of the house and heard them laughing and talking out there. I was inside of the house talking to the people inside of the house, and I decided to go home and I walked out the door and Pete, Cedell and Shorty was down from the door like they were scuffling, and I kept walking and about that time I heard a gun and I looked around and seen Shorty fall." He then said the accused and Shorty were about as far apart as from the witness stand to counsel for defendant who was then examining the witness, a distance of perhaps five or six feet.

That was the testimony. It is thus seen that the accused and Armstrong engaged in a scuffle, during which accused took from Armstrong a pistol; that defendant immediately, and within a distance of a few feet, deliberately shot Armstrong twice with the pistol, killing him almost instantly, at a time when even the defendant does not claim he was in any real, or apparent danger at the hands of Armstrong, or that Armstrong was making any hostile demonstration whatever towards him. He does not plead self-defense. At most, he seems to say it was merely a friendly contest. If that be friendship, then it must be said that this was a most unique manner of demonstrating it. ██ ██ The only thing uncertain here was the motive, and that is supplied under the law by the deliberate use of a deadly weapon. Apparently the only person who could disclose the motive or reason for the killing was the defendant himself, and he did not testify.

We believe it is evident the trial court correctly refused to peremptorily instruct the jury to acquit the defendant.

██ ██ Appellant next complains of an instruction granted the State. The contention poses a serious ques-

tion. The instruction reads: "The court instructs the Jury for the State that the killing of a human being without the authority of law is either murder or manslaughter. Murder when done with the deliberate design to effect the death of the person killed, and manslaughter when done in the heat of passion, without malice and without any premeditation." It then tells the jurors that if they find defendant guilty of murder their verdict might be in one of three forms, setting them out. It then says "The Court further instructs the Jury, that if you believe from all the evidence in this case that the defendant is not guilty of murder, as charged in the indictment, but do believe from all the evidence introduced in this case, beyond a reasonable doubt, that the defendant is guilty of manslaughter, then you should so find * * *", and then sets out the form of the manslaughter verdict.

The first quoted part of this instruction was granted to the State as a completed instruction in Wiggins v. State, 199 Miss. 114, 23 So. (2d) 691, 692. The Court said "We have carefully considered this instruction and do not consider it error." The same quotation appeared as part of an instruction obtained by the State in the case of Crawford v. State, Miss., 54 So. (2d) 230, and the quoted definition of manslaughter did not work a reversal of that case.

However, it will be noted that in the instruction under consideration the latter part, instead of detailing the elements the jury must find to exist in order to convict of manslaughter, simply said the jury, under the stated requirements, might find defendant "guilty of manslaughter". That referred the jury back to the first part of the instruction for a definition of manslaughter. We do not approve that method. It is better to detail the elements essential to constitute the crime rather than refer back to the general definition thereof. However, we do not think the jury was mislead by this, especially in view of an instruction obtained by the de-

fendant setting out his theory of defense. That instruction reads: "The Court instructs the jury that if the jury believes from the evidence that the deceased and the defendant and a number of parties were in the yard of Ellis Blue, and that there had been and was a scuffle between deceased and various members of the party, and without any altercation the deceased and the defendant began to scuffle, the deceased being armed with the pistol in evidence, and in the tussle the deceased was shot as a result of the friendly scuffle, then the defendant is not guilty, and if the jury has a reasonable doubt as to the occurrence as being stated, then the defendant is likewise not guilty." Therefore, under the instructions, the jury was confronted with the alternative of finding defendant guilt of murder or manslaughter or not guilty. The instruction of the State set out a definition of murder and manslaughter,. which, at least was not disapproved in the Wiggins case, supra, and the instruction of defendant detailed his theory of defense, which, if the jury had believed, would have resulted in his acquittal.

An instruction which fails to properly define the elements of the crime may be cured by other instructions which correctly define the crime. Upton v. State, 143 Miss. 1, 108 So. 287. Erroneous instructions may be cured by correct instructions, all considered together. Thomas v. State, 200 Miss. 220, 26 So. (2d) 469; Johnson v. State, Miss., 46 So. (2d) 924; Crawford v. State, supra.

We cannot see how defendant was prejudiced. It is undisputed that he killed Armstrong by shooting him with a pistol. He did not plead self-defense. There is no suggestion that he was in real or apparent danger at the hands of Armstrong. His theory was the shooting took place during the scuffle, or horseplay, between accused and Armstrong. He submitted his theory to the jurors, who rejected it. They had good ground for doing that. The evidence shows a deliberate shooting to kill with a deadly weapon, not an accident or playful gesture.

Affirmed.

**Hall, J.,** took no part in the decision of this case.